**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LARRY ALLEN STOUT,
Petitioner-Appellee,

v.                                                          No. 95-4007

J. D. NETHERLAND, Warden,
Respondent-Appellant.

LARRY ALLEN STOUT,
Petitioner-Appellant,

v.                                                          No. 95-4008

J. D. NETHERLAND, Warden,
Respondent-Appellee.

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-91-719-R)

Argued: July 8, 1996

Decided: September 3, 1996

Before WILKINSON, Chief Judge, and HAMILTON and
WILLIAMS, Circuit Judges.

_____

Reversed in part and affirmed in part by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert H. Anderson, III, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Arthur Patrick Strickland, Roanoke, Virginia, for Appellee. **ON BRIEF:** James S. Gilmore, III, Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Mark E. Olive, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Larry Allen Stout brought this action pursuant to 28 U.S.C.A. § 2254 (West 1994), challenging the constitutionality of his convictions for robbery and capital murder and his respective sentences of life imprisonment and death.[1] The district court granted relief as to Stout's conviction and sentence for capital murder, ordering that Stout be granted leave to withdraw his guilty plea and replead; the court denied relief as to the robbery count. Virginia now appeals, asserting that the district court erred in concluding that Stout received constitutionally deficient representation during the penalty phase of the state-court proceedings. Stout cross-appeals the district court's ruling that certain of his claims were not properly before the court. Because we conclude that Stout did not receive ineffective assistance of counsel, we reverse the portion of the district court's order granting habeas relief on Stout's conviction and sentence for capital murder and remand with instructions to reinstate Stout's death sentence. We

_____

[1] Stout brought suit against J.D. Netherland, warden of the institution where Stout is incarcerated. For ease of reference, we will refer to the Commonwealth of Virginia (Virginia) as Respondent.

2

affirm the district court's order in all other respects, and thereby reject Stout's cross-appeal.

I.

Stout pleaded guilty in a Virginia court to the robbery and capital murder of Jacqueline Kooshian, the proprietress of a dry cleaning establishment known as Trimble's Cleaners. Virginia offered the following evidence in support of Stout's guilty plea. On February 19, 1987, Stout, wearing a camouflage jacket, entered Trimble's Cleaners near closing time when Kooshian was alone in the store. Stout's girlfriend and accomplice, Debra Littrell, waited for him a short distance from the entrance to Trimble's Cleaners. Using a fictitious name, Stout told Kooshian he was there to pick up some clothing. When Kooshian turned to the racks of clothing, Stout approached her from behind, grabbed her by her hair, and slashed her throat with a knife. Clutching her bleeding throat, Kooshian ran into the street. A passing motorist stopped to offer assistance, but Kooshian bled to death en route to a hospital. Littrell left the scene upon seeing Kooshian run out of the store.

After Kooshian exited Trimble's Cleaners, Stout absconded with two bank deposit bags and a purse belonging to Kooshian; these items had been sitting on a countertop when Stout entered Trimble's. Stout returned to the apartment he and Littrell shared with her mother, Carole Lauber, and Lauber's boyfriend, Harley Rathburn. Later, Stout told Littrell that "the girl could not live the way I cut her." (J.A. at 149.) The next day, upon learning of Kooshian's death, Stout stated that he felt "more at ease." (J.A. at 150.)

Littrell confessed her and Stout's involvement in the crime to Lauber upon learning that Rathburn intended to use a suitcase he owned in which Stout had hidden evidence of the robbery and murder. Rathburn later consented to a search of the suitcase, which revealed a prescription issued to Jacqueline Kooshian, a telephone card issued to Trimble's Cleaners, checks payable to Trimble's Cleaners, a purse, later identified as Kooshian's, that contained photographs of Kooshian's children,[2] and a camouflage jacket.

_____
[2] A fingerprint found on one of the photographs matched Stout's.

3

Other evidence at the plea hearing tended to show that Stout and Littrell premeditated the robbery. First, Kooshian's mother testified that two days before the murder, Stout came into Trimble's and spoke briefly with Kooshian. A Trimble's employee testified that Littrell entered the store three days before the murder and inquired when Trimble's closed; the employee also testified that she had observed Stout "walking past [Trimble's] at different times of that week of the 19th. He would disappear and then would show back up standing across the street, directly across from" Trimble's. (J.A. at 124.) In addition, there was testimony that Stout had "cased" another dry cleaning establishment up the street.

A forensic pathologist, Dr. William Massello, testified that Kooshian suffered "a cutting wound to the left side of the neck" that "show[ed] a direction from left to right going slightly downward, cutting into the soft tissue of the neck and running to the voice box." (J.A. at 179.) The cut was approximately two inches deep at its deepest point; it became progressively deeper from left to right. The cut severed one of Kooshian's jugular veins and was "rapidly lethal." (J.A. at 183.) Dr. Massello testified that the wound was characteristic of one inflicted by coming behind the victim and slashing left to right with the right hand. Another witness identified the murder weapon by comparing the tool marks on Kooshian's larynx to the tool marks made by a hunting knife retrieved from Stout's person upon his arrest.

Stout offered no evidence during the plea hearing, and his counsel, William Bobbitt, engaged in only limited cross-examination of the witnesses. Based on the evidence presented to it, the trial court accepted Stout's guilty plea and proceeded directly to the penalty phase of the proceeding.

Over Stout's objection, Virginia introduced the testimony of three women whom Stout had robbed in separate incidents during the two months preceding the attack on Kooshian, while Stout was living in Florida. Two of the women testified that just before closing, Stout had entered the convenience stores where they worked alone. Brandishing a knife, Stout ordered the women to lie on the floor while he took money from the cash register. The third woman testified that Stout had snatched her purse outside a restaurant.

4

Debra Littrell testified that she and Stout made their living by committing robberies like those described above. Littrell also testified that she had overheard Stout and her ex-husband discussing the murder of two drug dealers; according to Littrell, Stout and her ex-husband had been hired to commit the murders after the victims reneged on a narcotics transaction.

Stout then presented his case in mitigation. Stout first called the chief correctional officer for the facility in which he was incarcerated, who testified that Stout had not presented any disciplinary problem. The parties stipulated that one of Stout's former employers in Florida would have testified that Stout was an excellent employee. Stout also called his cellmate, who testified that he had been helping Stout, who was almost entirely illiterate, learn to read. The trial court then adjourned the hearing so that a presentencing report could be prepared.

The sentencing hearing was reconvened several months later, at which time the presentencing report was received in evidence. The report contained the following information regarding Stout's family history:

> [Stout] was reared in a substandard economic situation with very little parental guidance and without the benefit of an appropriate male role model. [Stout] is the youngest child born to his mother, Sylvia Stout, and during our interviews indicated he did not know who his father was but had always been told he was an Indian. . . .[3]  The domestic situation was such that when [Stout] was approximately four years old he was placed in a foster home for a short period of time due to problems which existed between Stout and Calvin Stout[, Stout's stepfather, described elsewhere in the report as "an indolent alcoholic,"] as [Calvin] Stout would not accept [Stout] due to his dark skin color. Stout recalled being physically abused by [Calvin] Stout which was in fact confirmed by [Stout's] mother. The family was said to have remained in the Des Moines, Iowa area until around 1970 or

_____

[3] Apparently, Stout's brothers believe that his father was a black man with whom Sylvia Stout, who is white, had had a brief affair.

> 1971 when they moved to the Cedar Rapids, Iowa area. It was stated shortly after this the family became involved in migrant work[,] . . . living in states such as California, Florida, Washington, Oregon, and Ohio. Stout himself was very much involved in the work force, therefore, making it impossible for him to receive any formal education.

(J.A. at 44.) Bobbitt also introduced a letter from Stout's mother stating that Stout was not a violent person but that his migratory childhood and racially mixed parentage had been hard on him. Bobbitt elected not to introduce a psychological report that, in addition to discussing in detail Stout's background of physical and sexual abuse, noted that Stout suffered from anti-social personality disorder.

Stout testified, relating his history of moving from state to state to follow harvesting work. Stout told the court that he became addicted to cocaine at the age of eighteen and acknowledged committing the convenience store robberies, in addition to other crimes, to support his drug habit. Regarding the Kooshian murder, Stout stated that he entered Trimble's Cleaners, asked Kooshian for some clothing, walked up behind her with the knife, and told her to lie on the floor. Stout then said that "[s]he throwed [sic] her hands up and started hollering and I felt like she grabbed my wrist or she did it somehow and I went to shove her and in the long run, she got cut." (J.A. at 338-39.) Stout told the court that he felt "[s]cared, sick" after the incident. (J.A. at 339.) He also expressed remorse for the crime, saying, "I'm sorry for what I did. If that's [sic] anyway I could bring the lady back, I would, I would be glad to swap changes with her, she could have her life back. . . . I think about it most everyday . . . ." (J.A. at 340.)

On cross-examination, Stout denied that the hunting knife identified as the murder weapon was the one he had used in the attack on Kooshian, insisting instead that he had used a kitchen knife. Stout also denied killing the two drug dealers, and asserted that he had not "cased" Trimble's during the week before the robbery.

During his argument to the trial court regarding sentencing, Bobbitt asserted that the robbery of Trimble's was an "impulsive act" and that Stout evidently intended to conduct the same kind of robbery that he had committed in the convenience store cases, but "things went

6

wrong." (J.A. at 368.) Bobbitt also argued that, so long as he was in jail, Stout was not a troublemaker. Further, Bobbitt maintained that Stout had evidenced his remorse by pleading guilty to the crime.

The trial court sentenced Stout to life imprisonment on the robbery charge and to death on the capital murder charge. Specifically, pursuant to Virginia's capital sentencing scheme, the court found that Stout "constitute[d] a continuing serious threat to society" (future dangerousness) and that the murder of Kooshian "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim" (vileness). Va. Code Ann. § 19.2-264.2 (Michie 1995).[4] On direct appeal, the Virginia Supreme Court affirmed Stout's convictions and sentences, see Stout v. Commonwealth, 376 S.E.2d 288 (Va. 1989), and the United States Supreme Court denied his petition for a writ of certiorari, see Stout v. Virginia, 492 U.S. 925 (1989).

Stout thereafter filed a petition for a writ of habeas corpus in state court, raising numerous issues. The state habeas court -- the same judge who presided over Stout's guilty plea and sentencing hearing -- found that all of Stout's claims were procedurally barred except for his claim of ineffective assistance of counsel. The state habeas court denied this claim on the merits, rejecting, inter alia, Stout's argument that Bobbitt had been constitutionally ineffective for failing to advise Stout that a guilty plea to capital murder included an admission of premeditation and for failing to conduct a complete investigation into mitigating evidence regarding Stout's upbringing. The state habeas court explicitly rejected Stout's claim that Bobbitt had failed to present to the trial court information regarding Stout's childhood history of abuse, explaining that:

> The Presentence Report . . . gave an extensive narrative of the family and environmental background of the Petitioner. . . . The Petitioner testified on his own behalf and narrated his life from his earliest experiences. . ..

_____

**4** Only one of these two aggravating criteria must be found in order to justify the imposition of the death penalty. See Va. Code Ann. § 19.2-264.2 (stating that the trial court or jury must find future dangerousness or vileness before recommending the imposition of the death penalty).

7

> The court was aware of all the matters in mitigation that the Petitioner now says were not submitted to the court.

(J.A. at 481 (citations omitted).) The Supreme Court of Virginia denied leave to appeal.

On October 18, 1991, Stout filed this federal habeas petition in the United States District Court for the Western District of Virginia. Stout raised eleven claims addressing two central issues: the voluntariness of his guilty plea and the effectiveness of his trial counsel. In response to Virginia's motion to dismiss, the district court found that Stout had defaulted any claim that his guilty plea was involuntary, and accordingly dismissed the claims related to that issue; the court referred the remainder of Stout's claims to a magistrate judge. [5]

Thereafter, the magistrate judge held a two-day evidentiary hearing regarding Stout's claims of ineffective assistance of counsel. During the hearing, Stout presented the testimony of three attorneys who testified that Bobbitt's representation of Stout was constitutionally deficient due in part to Bobbitt's failure to present mitigating evidence regarding Stout's childhood, including the psychological report; several psychologists who testified regarding the abuse suffered by Stout at the hands of his stepfather and stated their conclusions that, despite the abuse, Stout was not a violent individual; and a law enforcement officer who testified that the wound in Kooshian's neck was consistent with Stout's version of the crime. Stout himself testified, describing the physical and sexual abuse he had suffered as a child and recounting the events of his childhood, including the ostracism by his family because of his color and the hardships of migrant labor. Stout also asserted that he was unable to understand the plea proceedings, maintaining that when he pleaded guilty he did not understand the meaning of the word "premeditation" and stating that he thought it meant something like "relaxation." (J.A. at 1175.) Stout further claimed not to have understood any of the questions the trial court

---

[5] While the case was pending before the magistrate judge, however, the district court granted Virginia's motion for summary judgment as to the remainder of Stout's claims. Upon Stout's motion for reconsideration, the district court vacated its order granting summary judgment and reinstated its order referring the case to a magistrate judge.

asked him during the plea colloquy, testifying that Bobbitt nodded or shook his head after each of the court's questions, thereby prompting Stout to the correct response.

Virginia responded to Stout's case with testimony from Bobbitt, who offered explanations for his decisions, and from Dr. Massello. Bobbitt testified that he did not introduce the psychological report because he was concerned that the conclusion in the report that Stout suffered from anti-social personality disorder might prejudice the court against Stout. Dr. Massello stated that the wound in Kooshian's neck could only be the result of a purposeful cut and thus was inconsistent with the type of accidental event claimed by Stout. In response to cross-examination questions suggesting that, because he is left-handed, Stout could not have inflicted the wound with his right hand while standing behind Kooshian, Dr. Massello testified that a person could have inflicted the wound with either hand, provided the cutting motion was purposeful rather than accidental.

The magistrate judge subsequently issued a report and recommendation suggesting that Stout's petition be denied. The magistrate judge concluded that Stout had defaulted on all but three of his eleven claims: that Bobbitt was ineffective for failing to advise Stout that a guilty plea to capital murder entailed an admission that the murder was premeditated; that Bobbitt was ineffective for failing to advise Stout that unadjudicated felonies could be used as evidence of future dangerousness; and that Bobbitt was ineffective for failing to investigate mitigating evidence regarding Stout's background. The magistrate judge rejected these claims on their merits, concluding that Bobbitt's representation of Stout had not been constitutionally deficient in these respects.

Upon de novo review of the magistrate judge's report and recommendation, the district court concluded that the writ should be granted. The district court adopted the magistrate judge's conclusion that Stout had defaulted all but the three claims and agreed with the magistrate judge that Bobbitt had not been ineffective for failing to advise Stout that unadjudicated felonies could be used as evidence of future dangerousness. The district court also concurred in the magistrate judge's conclusion that Bobbitt's advice to plead guilty "was a strategic choice that fell well within the range of professional compe-

9

tency demanded by the Sixth Amendment." (J.A. at 789.) Neverthe-less, the court concluded, Bobbitt's approach to the sentencing phase was constitutionally deficient due to his failure to advise Stout to enter a plea pursuant to North Carolina v. Alford, 400 U.S. 25, 37-38 (1970) (providing that a defendant may plead guilty without admitting all elements of the crime charged), and his failure to present mitigating evidence regarding Stout's background.

The district court first discussed Stout's guilty plea. The court observed that, while a guilty plea was an appropriate choice in light of the wealth of evidence against Stout, "[g]iven his client's version of the killing, instructing Stout to admit guilt to the element of premeditation verged on a breach of counsel's duty to both Stout and the tribunal." (J.A. at 790.) The district court also concluded that Stout's plea was neither knowing nor intelligent, based on the fact that the record did not reveal whether Bobbitt had ever informed Stout of the option of an Alford plea. Considering these factors in light of Stout's version of the crime offered at the sentencing hearing, the district court concluded that there was a "substantial likelihood" that Bobbitt's tactics jeopardized Stout's chances of receiving a life sentence by presenting the trial court with testimony that seemed "disingenuous or duplicitous." (J.A. at 794.)

The district court also criticized Bobbitt's handling of the sentencing phase, concluding that "counsel's decision to present virtually no case in mitigation did not constitute even a plausible strategic judgment." (J.A. at 795.) Specifically, the district court noted Bobbitt's "minimal" investigation of mitigating evidence (J.A. at 797), and discredited Bobbitt's explanation that psychiatric evidence regarding abuse of Stout by his stepfather was not introduced for fear that the psychiatrist's diagnosis of anti-social personality disorder would come out on cross-examination. At the very least, the court stated, Bobbitt could have presented the testimony of family members regarding the abuse. The district court also found that Stout was prejudiced by Bobbitt's ineffectiveness, finding that "[c]ounsel's reliance on the sentencer's benevolence despite the availability of so much more clearly convinces the court that but for counsel's unprofessional errors there exists a reasonable probability that the sentencer would have reached a different decision." (J.A. at 801.) Accordingly, the district court granted habeas relief as to Stout's capital murder convic-

10

tion, ordering that Stout's guilty plea be vacated and that he be given the opportunity to enter a new plea within sixty days.

Virginia now appeals, arguing that Stout did not receive ineffective assistance of counsel or, alternatively, that Stout was not prejudiced by any failings of Bobbitt's. Specifically, Virginia maintains that: (1) the district court was barred from considering whether Stout's counsel was ineffective for failing to advise Stout to enter an Alford plea and from holding that Stout's guilty plea was neither knowing nor intelligent because of Bobbitt's failure to render such advice; and (2) the district court erred in concluding that Stout received ineffective assistance of counsel during the sentencing phase and that Stout was prejudiced by Bobbitt's inadequate performance.**6** Stout cross-appeals, arguing that the district court erred in finding that he procedurally defaulted the remaining issues in his federal habeas petition. We consider these arguments seriatim.

II.

Virginia challenges the district court's conclusion that Bobbitt rendered ineffective assistance of counsel. Claims of ineffective assistance of counsel are evaluated pursuant to the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). A finding of ineffective assistance of counsel under Strickland requires a two-pronged showing. Id. at 687. First, Stout must show that Bobbitt's performance "fell below an objective standard of reasonableness." Id. at 688. Upon making a showing of ineffectiveness, Stout must then establish that Bobbitt's errors prejudiced him. Id. at 692. We review de novo the district court's legal determination that a habeas petitioner has satisfied his burden of showing deficient representation and prejudice. See Savino v. Murray, 82 F.3d 593, 598 (4th Cir. 1996), cert. denied, ___ U.S.L.W. ___ (U.S. July 17, 1996) (No. 96-5164).

_____

**6** Virginia also contends that, given its conclusion that Bobbitt rendered ineffective assistance during the sentencing phase, the district court improperly vacated Stout's guilty plea. Because we conclude that Stout did not receive ineffective assistance of counsel during either the guilt or the sentencing phase of his trial, and therefore reverse on that basis, we need not consider the propriety of the remedy fashioned by the district court.

11

In determining whether counsel's performance was objectively unreasonable, Strickland admonishes us to defer to counsel's tactical decisions, resisting the temptation to second-guess the adequacy of counsel's strategy based solely on the fact that that strategy has resulted in an adverse outcome. See Strickland , 466 U.S. at 689. Rather, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight[ by] reconstruct[ing] the circumstances of counsel's challenged conduct, and [ ] evaluat[ing] the conduct from counsel's perspective at the time." Id. In so doing, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

It is not enough, however, for Stout to show that Bobbitt's performance was ineffective; Strickland also requires Stout to show that he was prejudiced by Bobbitt's deficiencies. Id.  at 692. Absent an actual or constructive denial of the assistance of counsel, or a showing that counsel was laboring under an actual conflict of interest, the defendant is charged with the burden of proving that counsel's errors "actually had an adverse effect on the defense." Id. at 692-93. Moreover, the defendant must do more than show that counsel's errors might have had an effect on the proceeding. Id. at 693. A mere "conceivable effect" is not enough to "undermine[ ] the reliability of the result of the proceeding." Id. In order to establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. In the context of a guilty plea, the prejudice prong is slightly different:"[T]he defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). We note also that the inquiry into prejudice must necessarily be conducted on a case-by-case basis, for "[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." Strickland, 466 U.S. at 693. Of course, if counsel's actions do not fall below an objective standard of reasonableness, thereby failing to satisfy the first prong of the Strickland test, we need not consider the prejudice prong. Bell v. Evatt , 72 F.3d 421, 430 (4th Cir. 1995), cert. denied, 116 S. Ct. 2533 (1996).

12

A.

Virginia first disputes the district court's determination that Bobbitt's failure to advise Stout to enter an Alford plea constituted ineffective assistance of counsel. Virginia maintains that the district court was procedurally barred from considering this issue, pointing out that Stout's first and only mention of the possibility of an Alford plea is contained in his proposed findings of fact and conclusions of law submitted to the magistrate judge. Stout does not dispute this assertion, but rather argues that the district court did not rely on Bobbitt's failure to advise an Alford plea to reach its conclusion that Stout received ineffective assistance of counsel. According to Stout, the district court "took notice of Alford only to illustrate that trial counsel could have presented a coherent strategy throughout the case." (Cross-Appellant's Br. at 9.)

Assuming without deciding that the procedural issue raised by Virginia does not bar consideration of this issue on the merits, we conclude that the district court erred in granting relief on this basis. The district court concluded that, although Bobbitt's recommendation of a guilty plea did not fall below an objectively reasonable level of performance, given Stout's version of the crime, Bobbitt was ineffective for failing to advise Stout to enter an Alford plea, thereby admitting guilt to the murder but denying the element of premeditation. The district court evidently theorized that by advising Stout to enter an unconditional guilty plea to capital murder -- thus necessarily admitting that the murder was premeditated -- Bobbitt was forced to present an inconsistent defense at sentencing, where Stout testified that the killing was accidental. The entry of an Alford plea would have allowed Stout to maintain consistently that he did not premeditate Kooshian's murder, thereby bolstering his credibility with the trial court. In short, the district court concluded that the entry of an unconditional guilty plea posed a credibility problem for Stout because it made his testimony that the murder was an accident appear duplicitous, while the entry of an Alford plea would have presented no such strategic disadvantage.

We disagree with the district court's conclusion that the entry of an Alford plea necessarily would have bolstered Stout's credibility with the trial court. In our view, an Alford plea could very well have had

13

a negative effect on Stout's credibility. Although Stout consistently denied that he premeditated the murder, the evidence is overwhelming that Stout premeditated the robbery: As detailed above, Stout was seen observing the activities at Trimble's Cleaners during the week of the murder and at one point Littrell, Stout's accomplice, entered the store to inquire when it closed. These facts, in conjunction with Dr. Massello's testimony that the wound in Kooshian's neck was caused by a purposeful rather than accidental cut, provided ample evidence from which the court could determine that Stout premeditated the murder. In light of such evidence, the trial court might have determined that Stout's denial of premeditation showed a lack of credibility and, more important, a lack of true remorse for the crime. Bobbitt was thus faced with two possible courses of action, each of which presented a unique set of advantages and disadvantages. Where, as here, counsel makes a reasonable strategic choice based on his investigation into the facts of the case, we must defer to that strategic choice. See Strickland, 466 U.S. at 690-91. Accordingly, we conclude that Bobbitt's recommendation of an unconditional guilty plea did not fall outside the broad range of professional competence. Cf. Bell, 72 F.3d at 427-30 (finding that counsel's recommendation to pursue a verdict of guilty but mentally ill to a charge of capital murder in spite of the defendant's denial that he committed the crime was reasonable in light of the overwhelming evidence of the defendant's guilt).

Virginia also contends that the district court erred in concluding that Stout's guilty plea was not knowing and voluntary because there is no indication in the record that Bobbitt investigated and advised Stout of the availability of an Alford plea. While an intent to plead guilty does not relieve counsel of the duty to investigate possible defenses, there can be no prejudice resulting from the failure to investigate a defense that has no reasonable probability of success. See Savino, 82 F.2d at 599-600. Here, even the district court acknowledged that lack of premeditation was at best "a weak defense." (J.A. at 789.) We conclude that in light of the surfeit of evidence against Stout, there is no reasonable probability of success on a claim of lack of premeditation, whether litigated to a jury or a court as the result of a not-guilty plea or only to the court as the result of an Alford plea. Therefore, even if we assume that Bobbitt failed to advise Stout of the availability of an Alford plea and that such a failure constitutes inef-

14

fective assistance of counsel, Stout suffered no possible prejudice and thus is not entitled to relief on this basis.

B.

The district court determined that Bobbitt rendered ineffective assistance of counsel during the sentencing phase, finding that Bobbitt presented "virtually no case in mitigation" and that the failure to present a mitigation case "did not constitute even a plausible strategic judgment." (J.A. at 795.) The court concluded that the amount of mitigating evidence available to Bobbitt was "overwhelming" (J.A. at 795), including the alcoholism of Stout's parents, different treatment as a mixed-race child among whites, physical and sexual abuse, and forced migrant labor. Ultimately, the district court stated that it could discern "no conceivable advantage to counsel's approach" to sentencing. (J.A. at 800.)

Virginia disputes this conclusion, maintaining that Bobbitt's investigation and presentation of mitigating evidence did not constitute ineffective assistance of counsel. Stout responds that the district court correctly determined that Bobbitt's performance during the sentencing phase was deficient because Bobbitt failed to investigate and present mitigating evidence regarding Stout's childhood, despite the fact that Bobbitt had a five-month hiatus in the sentencing phase to do so. In particular, Stout challenges Bobbitt's decision not to introduce the psychological report, which set forth Stout's abusive background in graphic detail.

We set forth principles guiding the determination of whether counsel is ineffective for failing to offer evidence in mitigation in Bunch v. Thompson, 949 F.2d 1354 (4th Cir. 1991), cert. denied, 505 U.S. 1230 (1992). In Bunch, the petitioner's trial counsel decided not to introduce testimony of a psychiatrist who "could have informed the jury of Bunch's stressful childhood, which included domestic violence, and of his loss of self-esteem following the dissolution of his marriage." Id. at 1364. Counsel elected not to provide this testimony because the psychiatrist had also made findings that would be damaging to Bunch, and "[c]ounsel feared that the overall impact of the psychiatric testimony would be to reinforce all the negative aspects of Bunch's self-destructive behavior." Id. Counsel also chose not to

15

present the testimony of certain family members because of their unreliability. Id.

Noting that "[i]t is becoming all too commonplace to charge even diligent counsel in the midst of difficult circumstances with the adverse outcome in a capital case," id. at 1363, we concluded that Bunch's counsel had not been ineffective. We emphasized that a federal habeas court must not second-guess counsel's strategic choices, particularly those choices related to the investigation of mitigating evidence, which must be evaluated "with an eye for `reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" Id. (quoting Strickland, 466 U.S. at 691). With reference to the psychiatric testimony, we concluded that to rely upon a reasoned choice not to introduce such testimony because of negative conclusions that might surface as a basis for a finding of ineffective assistance of counsel

> would be to institute a rule that psychiatric testimony should always be offered in the sentencing phase, no matter how counter-productive or damaging. This we refuse to do. Trial counsel is too frequently placed in a no-win situation with respect to possible mitigating evidence at the sentencing phase of a capital case. The failure to put on such evidence, or the presentation of evidence which then backfires, may equally expose counsel to collateral charges of ineffectiveness. The best course for a federal habeas court is to credit plausible strategic judgments in the trial of a state case.

Id. at 1364 (emphasis added). The import of Bunch is that, provided there is a conceivable strategic advantage to the decision not to introduce certain evidence in mitigation, that choice is virtually unassailable on collateral review. See also Turner v. Williams, 35 F.3d 872, 896-97 (4th Cir. 1994) (concluding, based on Bunch, that trial counsel was not ineffective for limiting his investigation into the petitioner's background), cert. denied, 115 S. Ct. 1359 (1995).

We conclude that Bobbitt's investigation and presentation of mitigating factors did not constitute ineffective assistance of counsel. There is no dispute that Bobbitt was aware of Stout's abusive family background by virtue of the psychological report. During the hearing

16

before the magistrate judge, Bobbitt testified that he made the strategic decision not to use the report because it concluded that Stout suffered from anti-social personality disorder and was likely to commit acts of violence in the future:

> Mr. Stout meets the . . . criteria for Antisocial Personality Disorder. . . . Since the age of 15, he has maintained a pattern of irresponsible and antisocial behavior including an inability to sustain consistent work, failure to conform to social norms with respect to lawful behaviors as evidenced by his multiple burglaries and robberies, evidence of failure to plan ahead such as his impulsive move from Florida to Virginia and the killing of Mrs. Kooshian during the robbery, as well as exhibiting a lack of remorse for prior robberies and burglaries. People with this disorder have a life long history of altercations from which they appear not to learn from their mistakes.

(J.A. at 1399-1400.) Bobbitt concluded that this information would contrast negatively with his strategy to portray Stout as a non-violent person who was not likely to cause trouble in the future, thereby precluding a finding by the trial court of future dangerousness. Moreover, Bobbitt asserted that part of the reason he elected to have Stout sentenced by the court was that he planned to appeal to the judge with legal, rather than emotional, arguments. Bobbitt also stated that he contacted or made repeated attempts to contact all potential witnesses whose names were given to him by Stout and, as noted above, presented the testimony of several witnesses, all in an effort to present mitigating evidence without resorting to the psychological report.

We conclude that under the very deferential standard enunciated in Bunch, Bobbitt's representation of Stout during the sentencing phase was not ineffective. Bobbitt made a conscious, strategic decision not to present a detailed description of Stout's history for fear that such information would have an aggravating, rather than mitigating, effect. Such a fear is certainly a plausible reason not to present certain evidence; indeed, it is the precise rationale we validated in Bunch. Moreover, in light of the detailed description of Stout's background contained in the psychological report, there can be little doubt that Bobbitt was adequately apprised of the relevant information; thus,

17

there was no lack of adequate investigation. Accordingly, we conclude that Bobbitt's investigation and presentation of mitigating evidence did not constitute ineffective assistance of counsel and reverse the district court's decision to the contrary.

III.

We now turn to the issues raised in Stout's cross appeal. Finding his contentions to be without merit, we address them only briefly.

A.

Stout first contends that the district court erred in concluding that he failed to exhaust in state court three claims raised in his federal habeas petition that related to Bobbitt's alleged ineffectiveness in advising Stout to plead guilty without first ensuring that doing so would enable Stout to avoid a death sentence. With respect to this issue, the district court adopted the magistrate judge's conclusion that although Stout challenged Bobbitt's effectiveness in state court, Stout "did not assert, either directly or in language that can fairly be interpreted as such, that his counsel was ineffective because there was no plea agreement and the investigation that formed the basis of the advice to plead guilty was inadequate." (J.A. at 670-71.)

Stout challenges this ruling, asserting that he raised these claims either in a pro se writ of error he filed with the Virginia Supreme Court while his case was pending on direct review, or in his state habeas petition. We disagree. Our jurisprudence is such that in order to satisfy the exhaustion requirement, a habeas litigant must present his claims "face-up and squarely," thus providing the state court with "a full and fair opportunity" to consider them. Mallory v. Smith, 27 F.3d 991, 994-95 (4th Cir.) (internal quotation marks omitted), cert. denied, 115 S. Ct. 644 (1994). Mere "vague whispers" of a claim are not sufficient to satisfy the exhaustion requirement. Id. at 995-96. Based upon our review of the record, we conclude that neither Stout's pro se pleading on direct appeal nor his state habeas petition raised the claims related to Bobbitt's failure to secure a life sentence in exchange for Stout's guilty plea. We therefore affirm the district court's conclusion that these claims are procedurally barred.

18

B.

The district court also concluded that two claims regarding the validity of Stout's guilty plea were barred by the rule of Slayton v. Parrigan, 205 S.E.2d 680, 682 (Va. 1974), cert. denied, 419 U.S. 1108 (1975). Under Slayton, a habeas petitioner is barred from pressing a claim available to him on direct appeal. Since Stout could have, and should have, challenged the validity of his guilty plea on direct appeal, the district court concluded, Stout was precluded from challenging the validity of his plea in any subsequent proceedings.

Stout asserts that the procedural bar of Slayton is inadequate for two reasons. First, Stout posits that the rule is unfair as applied to him because he could not have challenged his guilty plea on direct appeal without a change of counsel. This simply is not true; if Stout's plea was involuntary, (as opposed to being the product of ineffective assistance of counsel) there is no reason why Bobbitt could not make such an argument on direct appeal. Second, Stout maintains that the Slayton rule is not applied consistently, and therefore falls prey to the rule in James v. Kentucky, 466 U.S. 341, 348-49 (1984) (holding that a state procedural bar is not adequate unless the rule is firmly established and regularly followed). Stout's assertion that Slayton is inadequate because the Virginia Supreme Court has never published an opinion applying Slayton to a challenge to a guilty plea is unpersuasive. Virginia courts regularly apply Slayton to claims that could have been raised on direct appeal, but were not. See, e.g., Strickler v. Murray, 452 S.E.2d 648, 651 (Va.), cert. denied, 116 S. Ct. 146 (1995); Epperly v. Booker, 366 S.E.2d 62, 67 (Va. 1988); Fitzgerald v. Bass, 366 S.E.2d 615, 621 (Va. Ct. App. 1989) (en banc), cert. denied, 493 U.S. 945 (1989). Accordingly, we reject Stout's challenge to the district court's ruling that these claims are procedurally barred.

C.

Finally, Stout maintains that the district court erred in adopting the magistrate judge's conclusion that Stout's two remaining claims -- that Virginia's aggravating factors are vague and overbroad and that the trial court's findings of vileness and future dangerousness were arbitrary and capricious -- were procedurally barred. The magistrate judge concluded that the vagueness and overbreadth claims were

19

barred by Stout's guilty plea and the rule in <u>Hawks v. Cox</u>, 175 S.E.2d 271, 274 (Va. 1970) (holding that claims previously determined are barred from consideration by a habeas court). The magistrate judge found that Stout's claim that the trial court's findings were arbitrary and capricious was barred by his failure to raise the issue in state court. <u>See Bassette v. Thompson</u>, 915 F.2d 932, 936-37 (4th Cir. 1990), <u>cert. denied</u>, 499 U.S. 982 (1991). We agree with these conclusions, and therefore reject Stout's arguments to the contrary.

IV.

We conclude that Stout did not receive ineffective assistance of counsel during the guilt and sentencing phases of his trial for robbery and capital murder. Accordingly, we reverse the portion of the district court's order granting Stout's petition for a writ of habeas corpus and remand with instructions to reinstate the death sentence as imposed by the Commonwealth of Virginia.[7] We reject Stout's contentions on cross-appeal that the district court erred in concluding that certain of his claims were procedurally barred, and thus affirm that portion of the district court's order.

<u>REVERSED IN PART AND AFFIRMED IN PART</u>

_____

[7] Because we reject Stout's claims on the basis that we do, we need not consider the effect on this case of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), which imposes even more demanding standards on habeas petitioners. <u>See</u> <u>Sherman v. Smith</u>, No. 94-6831, 1996 WL 397248, at *10 n.1 (4th Cir. July 17, 1996) (en banc).

20